Filed 7/12/24

CERTIFIED FOR PARTIAL PUBLICATION*

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

---

ANTHONY ASARO,

    Plaintiff and Respondent,

    v.

JON JOSEPH MANISCALCO et al.,

    Defendants and Appellants.

D080874 (Consolidated with D081481)

(Super. Ct. No. 37-2015-00034908-PR-TR-CTL)

---

    CONSOLIDATED APPEALS from judgments of the Superior Court of San Diego County, Robert C. Longstreth, Judge. Affirmed.

    Van Dyke & Associates, Richard S. Van Dyke, and Geoffrey J. Farwell for Defendants and Appellants Jon Maniscalco and Michael Maniscalco.

    Law Office of Christine Rister and Christine M. Rister; Stratege Law and J. Scott Scheper for Defendants and Appellants Matteo Giacalone and Madelyn Giacalone.

    Higgs Fletcher & Mack, John Morris, Roland A. Achtel, Scott Ingold, and Steven M. Brunolli for Plaintiff and Respondent Anthony Asaro.

---

\*     Pursuant to California Rules of Court, rule 8.1110, this opinion is certified for publication with the exception of parts B.1, B.4, and D. of the Discussion.

This litigation arises out of the family trust of Nicola and Antoinette Giacalone, who are both deceased.[1] The parties to the litigation are various beneficiaries and/or former trustees of the family trust. Anthony Asaro, a trust beneficiary, prevailed on his petition, which alleged wrongdoing by two sets of successive cotrustees.

Jon Maniscalco, a former trustee and beneficiary, appeals the resolution of Asaro's claims against him for breach of fiduciary duties owed to the trust and financial elder abuse of Antoinette. He argues: (1) Asaro lacked standing to assert his claims; (2) Asaro's claims were time-barred; (3) Asaro's claims were released pursuant to a settlement agreement between Jon and the then-trustees, including Nicola; (4) Asaro's elder abuse claims were not supported by substantial evidence; and (5) the court improperly calculated damages under Probate Code[2] section 859 and improperly awarded those damages to Asaro individually. We find no reversible error and affirm.[3]

---

[1] Because the case involves various family members with the same last name, we refer to these individuals by their first names, intending no disrespect.

[2] All further statutory references are to the Penal Code.

[3] Jon's brother Michael Maniscalco appealed the dismissal of his separate petition against former cotrustees Matteo and Madelyn Giacalone (together, the Giacalones). However, at oral argument, the parties agreed that that appeal is now moot. Accordingly, the appeal is dismissed. The parties to Michael's appeal shall bear their own costs.

## FACTUAL AND PROCEDURAL BACKGROUND

### A.  *The Giacalone Family Trust and Community Property Agreement*

Nicola and Antoinette were married in 1953.  In 1985, they created the Giacalone Family Trust (the Trust) that is the subject of this dispute, designating themselves as cotrustees.  They simultaneously executed a "Community Property Agreement" that provided, except as to a small number of enumerated assets,

> "[A]ll property acquired by either or both [h]usband and [w]ife since the date of their marriage, whether before or after the date of this Agreement and regardless of the form of title by which such property was acquired, was then held, is presently held, or shall be held, and all rents, issues and profits from such property, shall be the community property of husband and wife."

In 2005, Nicola and Antoinette assigned to the Trust "all of their right, title, and interest in and to all of the assets owned by either of them that would otherwise be subject to a probate proceeding on the death of either spouse."

Under the terms of the Trust, which was restated entirely in 2005, when the first spouse died, the Trust was to be divided into a "Survivor's Trust" and an irrevocable "Residual Trust."  The Survivor's Trust would consist of the surviving spouse's one-half share of community property, plus all of that spouse's separate property.  The Residual Trust would contain the balance, comprising the deceased spouse's one-half interest in the community property.  Both Asaro and Jon are beneficiaries of the Residual Trust.

### B.    *Jon's Term as Nicola's Fiduciary and Cotrustee*

In April 2009, Nicola appointed his nephew Jon as his "attorney-in-fact" with broad powers over his assets.  He also named Jon successor trustee, to take effect upon Nicola's "resignation, death or incapacity."  By

3

that point, Antoinette's Alzheimer's disease had rendered her incapacitated under the terms of the Trust and incapable of managing her financial affairs.

In January 2010, Jon and Nicola cashed out a certificate of deposit (CD) worth $200,019.17 from an account held by Nicola and Antoinette. The cashier's check was payable to both Jon and Nicola. In February 2010, Jon alone cashed out a second CD, worth $230,000, held by Nicola and Antoinette at a different bank. This cashier's check was payable solely to Jon. Jon deposited both checks to a joint account he held with Nicola. All of the funds in that joint account were ultimately transferred to Jon or his family members.

In April 2010, Jon transferred a $970,000 brokerage account held by the Trust to a joint account with Nicola. In September 2010, Jon executed an unsecured promissory note for $970,000, payable to Nicola individually, which was to be repaid after 15 years or forgiven after Nicola (then 84) died. Jon then transferred the money through a series of different joint accounts with Nicola before finally transferring all of it to himself and his wife in April 2011.

In September 2010, Nicola conveyed a property on Adams Avenue (the Adams Avenue Property) from the Trust to Jon's real estate company. Jon executed a promissory note for $196,000, payable to Nicola individually to be repaid after 15 years or forgiven after Nicola's death. Jon did not have the property appraised before drafting this note, but evidence at trial showed that its value was $261,000.

In November 2010, Nicola executed a sixth amendment to the Trust, formally appointing Jon as cotrustee. In the same amendment, Jon and Nicola removed Asaro as a beneficiary of the Residual Trust. In this action, the trial court held that the removal of Asaro as a beneficiary of the Residual

4

Trust was invalid and that Jon "fraudulently obtained [the] Sixth Amendment." Jon does not challenge those findings on appeal.

Antoinette died in late November. According to her will, her entire estate was to pass to the Trust. Jon and Nicola did not inform the beneficiaries that the Residual Trust had become irrevocable on Antoinette's death. (See § 16061.7 [trustees shall serve a notification to beneficiaries and heirs within 60 days "when a revocable trust or any portion thereof becomes irrevocable"].) Nor did Jon and Nicola divide the Trust estate between the Residual Trust and the Survivor's Trust within six months of Antoinette's death, as called for by the terms of the Trust.

The Trust paid Jon $5,000 a month in "co-trustee fees" from April 2010 to May 2011, and $30,000 in "real estate" fees in late 2010. Jon, his wife, and his brother Michael also received $5,000 to $10,000 nearly every month from Nicola during this period, purportedly as "gifts."

C. **_Jon's Petitions and the 2011 Settlement_**

By May 2011, Nicola suspected Jon was stealing. As a result, he revoked Jon's power of attorney and removed him as cotrustee. Nicola then appointed his nephew Matteo and Matteo's wife Madelyn as cotrustees and gave Matteo durable power of attorney.

In July 2011, Jon filed petitions to remove Madelyn and Matteo as cotrustees and to have a conservator appointed for Nicola on the grounds that Nicola was "increasingly confused about the nature of his assets" and that Matteo and Madelyn were "not capable of protecting the [Trust] beneficiaries." Nicola objected to both petitions, alleging that Jon had misappropriated assets. He submitted statements from two physicians who both reported that he had significant cognitive impairment, including moderate dementia, but nonetheless concluded that he had sufficient capacity

5

to continue to manage his own finances. The court-appointed conservatorship investigator, however, recommended the appointment of a third-party conservator and guardian ad litem in light of Nicola's cognitive deficits.

In October 2011, Jon, Nicola, Madelyn, and Matteo participated in a one-day mediation. Nicola did not attend the mediation but, according to Matteo, was consulted telephonically. The parties agreed to settle Jon's petitions and to a broad release of claims related to his administration of the Trust (the Settlement Agreement). As part of the settlement, Jon dismissed his conservatorship petition, withdrew his objection to Madelyn and Matteo serving as trustees, and agreed to repay $970,000 that originated in the Trust-held brokerage account. Jon was permitted to keep other assets, including the Adams Avenue Property and the CD funds.

## D. *Nicola Dies and This Litigation Begins*

Nicola died in 2016. In 2017, Jon filed a joint petition against Matteo and Madelyn for alleged breaches of fiduciary duty. In 2018, Asaro filed his own petition asserting claims for breach of fiduciary duty against Madelyn and Matteo; breach of fiduciary duty against Jon; elder abuse by Jon (on behalf of Antoinette and Nicola); and return of trust property from Jon, Madelyn, and Matteo. Asaro amended his petition in 2019.

In 2020, the trial court ruled that the $970,000 paid by Jon in connection with the settlement was community property and thus one-half needed to be returned to the Residual Trust as Antoinette's share of the asset. This court affirmed, concluding substantial evidence supported the probate court's finding. (*Asaro v. Giacalone* (July 15, 2021, D077596) [nonpub. opn.].)

6

After remand, the probate court held an eight-day trial on the parties' remaining claims. It ultimately issued a statement of decision in favor of Asaro, ruling against Jon and the Giacalones.

With respect to Asaro's claims against Jon, the court held that Jon breached his fiduciary duties to the Trust and committed financial elder abuse against Antoinette by: (1) "improperly converting and misappropriating $430,000 in Certificates of Deposit owned by Nicola and Antoinette to himself"; (2) "improperly converting and misappropriating the Adams Avenue [P]roperty to himself in exchange for a doctored promissory note that was all but worthless to Nicola and Antoinette"; and (3) transferring "money to himself from Nicola and Antoinette's accounts for alleged professional and trustee fees." The court required Jon to reimburse the Residual Trust for $547,370, which included 50 percent of the value of the misappropriated property plus "appropriate prejudgment interest at a rate of seven percent." Pursuant to section 859, the court held Jon liable for twice the value of the property returned to the Residual Trust, a penalty of $1,094,740. It also ordered Jon to pay Asaro's attorney fees and costs. The court awarded the $1,094,740 penalty "to Asaro individually because the recovery against Jon is the result entirely of his efforts in this litigation, and because a contrary result could result in a partial payment to Jon of an amount awarded against him because of his own wrongdoing, which would be an inequitable result." Jon has appealed these rulings.

The court also resolved Asaro's petition against the Giacalones in favor of Asaro. Although the Giacalones filed a notice of appeal, they subsequently settled and have since voluntarily dismissed their appeal.

7

Jon challenges the court's resolution of Asaro's claims against him. First, he contends Asaro lacked standing to assert elder abuse claims on Antoinette's behalf. Second, he maintains Asaro's claims were time-barred. Third, he argues Nicola released all claims against Jon on behalf of the Trust and on behalf of Antoinette as part of the settlement. Fourth, Jon claims there was no substantial evidence that he committed financial elder abuse of Antoinette. Fifth and finally, he asserts the court improperly calculated damages under section 859 and wrongly awarded those damages to Asaro rather than the Trust.

## A. *Asaro Did Not Lack Standing*

Jon argues Asaro lacked standing to assert elder abuse claims on Antoinette's behalf because he was not her "successor in interest," as defined in Code of Civil Procedure section 377.11. Welfare and Institutions Code section 15657.3, subdivision (d)(1), specifically authorizes elder abuse claims on behalf of a decedent:

> "[A]fter the death of [an] elder or dependent adult, the right to commence or maintain an action [for financial elder abuse] shall pass to the personal representative of the decedent. If there is no personal representative, the right to commence or maintain an action shall pass to any of the following, if the requirements of Section 377.32 of the Code of Civil Procedure are met:
>
> > "(A) An intestate heir whose interest is affected by the action.
> >
> > "(B) The decedent's successor in interest, as defined in Section 377.11 of the Code of Civil Procedure.
> >
> > "(C) An interested person, as defined in Section 48 of the Probate Code, as limited in this subparagraph. As used in this subparagraph, 'an interested person' does not include a creditor or a person who has a claim against the estate and who is not an heir or beneficiary of the decedent's estate."

Jon first concedes that Antoinette did not have a "personal representative,"
but he later contradicts himself and claims Nicola was Antoinette's personal
representative because he was the executor of her will. (See § 58.) In either
case, individuals under Welfare and Institutions Code section 15657.3,
subdivision (d)(1)(A) through (C) had the right to commence an action on
Antoinette's behalf because,

> "[i]f the personal representative refuses to commence or maintain
> an action or if the personal representative's family or an affiliate,
> as those terms are defined in subdivision (c) of Section 1064 of
> the Probate Code, is alleged to have committed abuse of the elder
> or dependent adult, the persons described in subparagraphs (A),
> (B), and (C) of paragraph (1) shall have standing to commence or
> maintain an action for elder abuse."

(Welf. & Inst. Code, § 15657.3, subd. (d)(2).) Jon, as Nicola's nephew, was
family to the putative personal representative. (*Ibid.*; Prob. Code, § 1064,
subd. (c).) "An interested person, as defined in Section 48 of the Probate
Code" thus had standing to bring an elder abuse claim. (Welf. & Inst. Code,
§ 15657.3, subd. (d)(1)(C).)

> According to section 48,

> " '[I]nterested person' includes any of the following:

>> "(1) An heir, devisee, child, spouse, creditor, beneficiary,
>> and any other person having a property right in or claim
>> against a trust estate or the estate of a decedent which may
>> be affected by the proceeding.

>> "(2) Any person having priority for appointment as personal
>> representative.

>> "(3) A fiduciary representing an interested person."

Jon does not dispute that Asaro, as a beneficiary of Antoinette's trust estate,
is an "interested person." He argues, however, that Asaro must also qualify
as a "successor in interest." He relies on the prefatory language in Welfare

9

and Institutions Code section 15657.3, subdivision (d)(1) that states persons have standing "if the requirements of Section 377.32 of the Code of Civil Procedure are met." Jon maintains that anyone advancing a claim on behalf of a decedent must comply with Code of Civil Procedure section 377.32, which sets out a procedural requirement for any "person who seeks to commence an action or proceeding or to continue a pending action or proceeding as the decedent's successor in interest." Jon thus argues that intestate heirs or "interested parties" must also be "successors in interest."

We agree the statute would be clearer if the reference to Code of Civil Procedure section 377.32 had been placed in subdivision (d)(1)(B) of Welfare and Institutions Code section 15657.3 rather than in the prefatory language. Still, Jon's interpretation is not reasonable as it needlessly creates surplusage. (See, e.g., *People v. Valencia* (2017) 3 Cal.5th 347, 357.) Had the Legislature intended for successors in interest to be the *only* parties with standing to bring elder abuse claims on behalf of a deceased elder, it would not have listed three separate categories of parties, *including* the "decedent's successor in interest, as defined in Section 377.11 of the Code of Civil Procedure." (Welf. & Inst. Code, § 15657.3, subd. (d)(1).)

We further cannot accept this interpretation in light of the Legislature's stated purpose of "enabl[ing] interested persons to engage attorneys to take up the cause of abused elderly persons and dependent adults." (Welf. & Inst. Code, § 15600, subd. (j).) "This statement of legislative intent suggests the Legislature intended a broad definition of standing in the context of elder abuse cases." (*Estate of Lowrie* (2004) 118 Cal.App.4th 220, 227.)

Jon's cramped reading is neither the most reasonable interpretation of the plain language of the text, nor is it consistent with the statute's purpose.

10

Accordingly, we conclude Asaro had standing to pursue elder abuse claims on behalf of Antoinette.

## B.     *Asaro's Claims Were Not Time-Barred*

### 1.     *The Statement of Decision*

Jon argues the trial court's statement of decision was insufficient with respect to its statute of limitations holdings and that we must therefore remand for clarification.  "The trial court is not required to make an express finding of fact on every factual matter controverted at trial, where the statement of decision sufficiently disposes of all the basic issues in the case." (*Bauer v. Bauer* (1996) 46 Cal.App.4th 1106, 1118.)  "[A] trial court rendering a statement of decision under Code of Civil Procedure section 632 is required to state only ultimate rather than evidentiary facts because findings of ultimate facts necessarily include findings on all intermediate evidentiary facts necessary to sustain them." (*In re Cheryl E.* (1984) 161 Cal.App.3d 587, 599.)  In addition, " '[a] statement of decision is required to resolve all material issues of fact, not law.' " (*Bandt v. Board of Retirement* (2006) 136 Cal.App.4th 140, 163 (*Bandt*).)

The trial court found that "Asaro did not have actual or constructive knowledge of his claims prior to the date on which his claims would be barred by the statute of limitations had they accrued by then.  In addition, as stated above, his interest in the matter was hidden from him before that date, and for some time afterwards, by the improper and illegal actions of Jon Maniscalco."  The court thus held, "Asaro's claims are not barred by the statute of limitations.  His claims accrued during the applicable limitations periods, and the running of those periods would have been equitably tolled even if they had accrued outside the limitations period."  Contrary to Jon's

11

contentions, the trial court adequately explained the factual basis for its legal conclusions.

Jon vaguely claims "[i]t is difficult to discern the court's basis for finding that each of [Antoinette's] and [Nicola's] claims (asserted by Asaro) had not expired." But the court did not find that Asaro was asserting any claims on Nicola's behalf, so no factual findings were necessary in that regard. As to Antoinette's claims, the court made both ultimate and evidentiary findings, including that Antoinette had Alzheimer's disease and lacked the capacity to make legal decisions, that Asaro was a vested beneficiary of the Residual Trust, and that he did not have actual or constructive knowledge of the claims due at least in part to Jon's "improper and illegal actions."

Jon complains there are no grounds supporting the trial court's conclusion "that the running of the limitations periods 'would have been equitably tolled,' " or that "shed light on the reasonableness of Asaro's discovery of the acts alleged in his petitions years after the statute of limitations would have barred his action." In fact, the court clearly found that Asaro's "interest in the matter was hidden from him . . . by the improper and illegal actions of Jon," referencing earlier findings, including that Asaro was "improperly disinherited by Jon's fraudulently obtained Sixth Amendment to the Family Trust."

Finally, to the extent Jon argues the trial court did not adequately explain its legal reasoning, it was not required to do so. (See *Bandt, supra,* 136 Cal.App.4th at p. 163.) Regardless, "because we have reviewed [Jon's] legal contentions de novo, any failure on the part of the trial court to fully set forth the basis of its legal conclusions would be harmless." (*Ibid.*)

## 2. *Breach of Fiduciary Duty Claims*

Much of Jon's argument assumes that Asaro's breach of fiduciary duty claim is purely derivative of claims Antoinette and/or Nicola had during their lifetimes, and thus Asaro is barred because of Antoinette and Nicola's failure to bring a claim. But the trial court held that Jon was liable for breaching his fiduciary duties to the Trust, not to Antoinette or Nicola.[4] Beneficiaries of an irrevocable trust, like the Residual Trust, have their own causes of action against trustees that are not derivative of the settlors' rights. (See, e.g., § 16420, subd. (a); *Estate of Giraldin* (2012) 55 Cal.4th 1058, 1065, 1076 (*Giraldin*) [holding that when the settlor of a revocable trust appoints another as a trustee, once the settlor dies and the trust becomes irrevocable, the beneficiaries have standing to sue the trustee for breaches of fiduciary duty committed during the period of revocability].)

Jon also argues that because Nicola was at all times a trustee, his failure to bring a claim against Jon within the statute of limitations bars Asaro's claims. Jon cites *Triplett v. Williams* (1969) 269 Cal.App.2d 135, 137 (*Triplett*), which concerned a fraud claim by beneficiaries against a third party that was governed by the statute of limitations in Code of Civil Procedure section 338. (*Ibid.*, citing Stats. 1957, ch. 649, p. 1849, § 1 ["An

---

[4] Although Jon was not formally appointed cotrustee until November 2010, he does not challenge the trial court's finding that he owed duties directly to the Trust and Residual Trust, thereby forfeiting any such arguments. (See, e.g., *Browne v. County of Tehama* (2013) 213 Cal.App.4th 704, 726 (*Browne*).) Such a challenge would likely not be successful in any case because Jon had broad powers of attorney for Nicola (who was a trustee) and the Trust paid him $5,000 a month in "co-trustee fees" from April 2010 to May 2011. Moreover, Jon testified he did not change "what [he was] doing in terms of helping [his] uncle" after he was officially appointed cotrustee, apparently acting and holding himself out as a trustee while breaching his assumed duties.

action for relief on the ground of fraud or mistake. The cause of action in such case not to be deemed to have accrued until the discovery, by the aggrieved party, of the facts constituting the fraud or mistake."].) The plaintiffs' complaint did not allege when they learned of the fraud and instead relied on their purported lack of standing to toll the statute of limitations. (*Triplett*, at pp. 137–138.)

By contrast, Asaro's claim against Jon for breach of a trustee's fiduciary duties to the Trust had to be brought no more than "three years after *the beneficiary* discovered, or reasonably should have discovered, the subject of the claim." (§ 16460, subd. (a)(2); italics added.) The statute of limitations is thus expressly measured from the beneficiary's discovery of the subject of the claim. Asaro claims he did not discover the claim until 2017, and Jon has not established otherwise.

Assuming there are circumstances in which a trustee's knowledge of a breach by a cotrustee could start the statute of limitations with respect to a beneficiary's claim, this case does not present such facts. Nicola (who continued as a trustee until his death) facilitated Jon's breaches of fiduciary duties and participated in improperly concealing those breaches from Asaro.[5] Among other things, Nicola participated in Jon's improper and fraudulent removal of Asaro as a beneficiary.[6] In addition, Jon and Nicola as co-trustees

---

[5]    As explained below, Nicola suffered from significant cognitive decline at this time, impairing his ability to appreciate and protect the rights of the beneficiaries. (See § C., *post*.)

[6]    Although Jon claims "there was no finding that Jon's efforts to obtain the Sixth Amendment were intended to defraud Asaro, or any other party," the court expressly found Asaro was "improperly disinherited by Jon's fraudulently obtained Sixth Amendment to the Family Trust." Jon does not contest this finding.

failed to give any notice to Asaro or the other beneficiaries that the Residual Trust had become irrevocable. (See § 16061.7.) And, as discussed in further detail below, Nicola agreed to an improper, confidential settlement agreement without notifying any beneficiaries. (See § C., *post*.) Given that Nicola and Jon's joint actions and omissions wrongfully prevented Asaro from learning of potential claims, there is no reasoned basis why Nicola's knowledge could or should be imputed to Asaro.

As to his own knowledge, Asaro did not have reason to know of his claim more than three years before filing suit. Jon maintains "Asaro admitted that he knew he was a beneficiary of the Trust prior to 2009." But in the deposition testimony he cites, Asaro testified that he was told he would inherit from Nicola's "will" and specifically denied knowing about the Trust:

"Q: You've been a beneficiary of this trust since 2007. Are you aware of that?

"A: Well, orally from [Nicola].

"Q: Okay. What did [Nicola] tell you?

"A: He told me I was in his will.

"Q: Did he mention anything about his trust?

"A: No."

Jon's counsel then sought to conflate the will and the Trust throughout Asaro's deposition:

"Q: Okay. Do you know the difference between a will and trust?

"A: No.

"Q: When did he tell you that you were included in his will and trust?

15

"A:    Let me think.  Well, it was prior to 2009.  You know, I can't give you a specific year.

"Q:    After [Nicola] informed you that you were included in his— I'm going to use 'the will' or 'trust' interchangeably here.[7]

"A:    Yeah.

"Q:    After he told you that he was—you were included in his will or trust, did you inquire after that as to the documentation?

"A:    You know, I didn't really think that much about it, to tell you the truth.  It was just casual conversation."

Despite counsel's efforts, Asaro's deposition testimony does not support that he knew he was a beneficiary of the Trust.  At trial Asaro again testified:

"Q:    Did [Nicola] or Antionette ever mention to you something about having a trust?

"A:    No, I never heard any mention of trust."
(Capitalization omitted.)

He also said, "[Nicola] didn't confide in me in his interworkings [*sic*] of his so-called trust that I didn't even know he had or gave or that he was in." (Capitalization omitted.)

Jon further claims Asaro had inquiry notice of Jon's breaches because he knew there were "allegations of 'thievery' and 'stealing' involving Jon and the Trust."  (Boldface omitted.)  But this characterization takes some liberties with the record.  Nicola told Asaro that "that there was a little thievery going on," and Asaro later learned that Jon had "power of attorney."  Asaro never testified he knew that Jon was stealing *from Nicola's trust*.  The trial court

7       The citations in Jon's brief omits this statement, which provides important context for Asaro's testimony.

16

reasonably found that Asaro did not have reason to know of breaches of fiduciary duty to Nicola's trust, let alone that Asaro might have a cause of action against Jon.

### 3. *Elder Abuse Claims*

Asaro's claim for financial elder abuse of Antoinette, pursuant to Welfare and Institutions Code section 15657.5, had to be "commenced within four years after the plaintiff discover[ed] or, through the exercise of reasonable diligence, should have discovered, the facts constituting the financial abuse." (Welf. & Inst. Code, § 15657.7.) Jon does not contend that Antoinette "discover[ed] or, through the exercise of reasonable diligence, should have discovered, the facts constituting the financial abuse" at any point before she died. (*Ibid.*) Moreover, it is undisputed that Antoinette lacked legal capacity to make decisions at the time Jon misappropriated Trust property. Assuming without deciding that Antoinette's claim had accrued for statute of limitations purposes before her death, the limitations period was tolled during her lifetime. (See Code Civ. Proc., § 352, subd. (a) ["If a person entitled to bring an action, mentioned in Chapter 3 (commencing with Section 335) is, at the time the cause of action accrued either under the age of majority or lacking the legal capacity to make decisions, the time of the disability is not part of the time limited for the commencement of the

action."].)  Following her death, Antoinette's successors had at least four years to file a claim.  (See Code Civ. Proc., § 366.1, subd. (b).)[8]

As explained above, a number of people potentially had standing to assert a claim for elder abuse on Antoinette's behalf.  (See Welf. & Inst. Code, § 15657.3, subd. (d)(1).)  Implicit once again in Jon's argument is that we must impute Nicola's knowledge to Asaro because Nicola *also* could have brought a claim after Antoinette's passing.  Jon cites no authority in support of this argument, and we have found none.

In our view, to focus on someone else who might have brought a similar claim and what *they* knew would be contrary to the broad grant of standing and the clear intent of the Legislature to encourage elder abuse actions in the face of difficult family dynamics.  As explained above, Welfare and Institutions Code section 15657.3, subdivision (d)(2), authorized a broader group of parties to bring an elder abuse claim after Antoinette died because Jon, the subject of the claim, was Nicola's family member.  It would subvert the purpose of this statute to measure the limitations period based on Nicola's knowledge alone when the statute assumes that he was a conflicted party.

---

[8]     The statute of limitations for survivor claims often begins to run upon the passing of the person who had the right to bring the claim.  (See, e.g., *Parsons v. Tickner* (1995) 31 Cal.App.4th 1513, 1525 (*Parsons*).)  However, because Antoinette never knew of her claim, it seems reasonable to read the statute of limitations for elder abuse to run from when "the [*successor*] plaintiff [here Asaro] discover[ed] or, through the exercise of reasonable diligence, should have discovered, the facts constituting the financial abuse." (Welf. & Inst. Code, § 15657.7.)  (But see *Triplett, supra,* 269 Cal.App.2d at p. 137 [although decedent was incompetent from the time of the alleged fraud through her death, statute of limitations ran from her death].)  As the parties have not briefed this apparently open question, we need not and do not address it.

Furthermore, as with the breach of fiduciary duty claims, Nicola (with Jon's cooperation and assistance) improperly facilitated the concealment of potential causes of action from Asaro and others.  In addition to removing Asaro as a beneficiary and failing to give notice of the change in the Trust status, Nicola and Jon agreed to "refrain from commenting to any third party regarding the terms of [the Settlement] Agreement."  Confidential settlement of elder abuse claims is "disfavored" as a matter of policy in California, and such terms are presumptively unenforceable.  (See Code Civ. Proc., § 2017.310, subd. (a).)  In these circumstances, we find no legal or equitable basis for imputing to Asaro Nicola's knowledge of Antoinette's potential elder abuse claim against Jon.

Assuming the statute of limitations began to run as soon as Antoinette died, we conclude Asaro benefits from the "delayed discovery rule," "which postpones accrual of a cause of action until the plaintiff discovers, or has reason to discover, the cause of action." (*Fox v. Ethicon Endo-Surgery, Inc.* (2005) 35 Cal.4th 797, 807.)  "Under the discovery rule, the statute of limitations begins to run when the plaintiff suspects or should suspect that her injury was caused by wrongdoing, that someone has done something wrong to her." (*Jolly v. Eli Lilly & Co.* (1988) 44 Cal.3d 1103, 1110.)  As with the breach of fiduciary duty claim, Asaro did not have reason to know of a potential cause of action for elder abuse of Antoinette merely because he was told that he was in Nicola's will and Jon was stealing from Nicola.  Jon does not point to any other facts that would have put Asaro on actual or inquiry notice of Jon's financial elder abuse against Antoinette.  In addition, due to Jon's actions, Asaro was wrongfully deprived of information that might have put him on notice of this claim.  (See, e.g., *Parsons*, *supra*, 31 Cal.App.4th at pp. 1526–1527 [delayed discovery applied to survival claim brought 19 years

19

after it accrued where defendants concealed from plaintiff "key fact that [decedent] had never transferred" property to them and "further concealed that fact by falsely representing they were" the owners of the property].) Accordingly, we find Asaro's claim timely under the delayed discovery rule.

### 4. *Real Property*

Jon hastily contends that because Asaro's request for relief included return of the Adams Avenue Property to the Trust, the claim is governed by Code of Civil Procedure section 318, which provides: "No action for the recovery of real property, or for the recovery of the possession thereof, can be maintained, unless it appear that the plaintiff, his ancestor, predecessor, or grantor, was seized or possessed of the property in question, within five years before the commencement of the action." This provision applies "unless . . . a different limitation is prescribed by statute." (Code Civ. Proc., § 312; see *Hensler v. City of Glendale* (1994) 8 Cal.4th 1, 22.) Code of Civil Procedure section 318 is inapplicable because Asaro's claims for breach of fiduciary duty and elder abuse are governed by other statutes of limitations.[9]

### C. *Asaro's Claims Were Not Released Under the 2011 Settlement*

Jon next argues that Asaro is bound by the 2011 settlement between Jon on the one hand and Nicola, Matteo, and Madelyn on the other. The trial court found Asaro was not bound by the Settlement Agreement because: (1) "having been improperly disinherited by Jon's fraudulently obtained Sixth Amendment to the Family Trust[,] he was not a party to or notified of either

---

[9] Jon alludes to a claim for "fraud," which he also claims is barred by the statute of limitations. The trial court did not adjudicate a fraud claim separately or award damages for fraud, however, so there would be no relief available to Jon even if the fraud claim were barred by the statute of limitations.

of those proceedings or the settlement negotiations regarding them"; (2) "at the time that settlement was reached, [the] Giacalone[s] (. . . beneficiar[ies] of the Survivor's Trust) had a direct conflict of interest with Asaro (a beneficiary of the Residual Trust) such that it would be contrary to law and equity to bind Asaro to the agreement executed without notice to him"; and (3) given "his diminished capacity, the undue influence of Madelyn and Matteo Giacalone, and the conflicted representation by Anthony Romano, Nicola did not fully understand the circumstances relating to the CDs and the Adams Avenue properties, and he therefore lacked the capacity to knowingly and intelligently consent to the misappropriation of these properties."

Even before addressing the court's factual findings, we conclude the settlement agreement was fundamentally flawed insofar as it purported to bind beneficiaries without notice.[10] In addition, we conclude the court's factual findings with respect to Nicola's incapacity and Jon's participation in depriving Asaro of notice are well supported.

Jon argues that a trustee has absolute authority to release a claim belonging to the trust, relying on section 16242, which authorizes a trustee to

---

[10] With respect to the elder abuse claim, Jon fails to explain how Nicola acting in his individual capacity and as trustee could release a claim belonging to Antoinette's estate. He has thus forfeited the argument that the settlement agreement operates to bar Asaro's elder abuse claim brought on behalf of Antoinette. (See, e.g., *Browne, supra,* 213 Cal.App.4th at p. 726.)

21

"[r]elease, in whole or in part, any claim belonging to the trust."[11]  However, a trust beneficiary is empowered by statute to bring his own claim against a trustee for breach of trust.  (See, e.g., *Estate of Bowles* (2008) 169 Cal.App.4th 684, 691 (*Bowles*); § 16420 ["If a trustee commits a breach of trust," trust beneficiaries "may commence a proceeding" to, among other things, "compel the trustee to redress a breach of trust by payment of money or otherwise" or "set aside acts of the trustee."].)  "A beneficiary has standing to sue a *former* trustee for breach of trust, even when a successor trustee is available to do so."  (21 Cal. Trust and Probate Litigation (Cont. Ed. Bar 2023) § 21.46A, citing *Bowles, supra,* 169 Cal.App.4th 684.)

In addition, the ability of a beneficiary to consent to an act or omission or to release her claim against a trustee is circumscribed by the Probate Code.  (See §§ 16463, 16464.)  Trustees generally cannot escape liability if a beneficiary did not know of his rights or material facts, or if the release is not fair and reasonable.  (See §§ 16463, subds. (b)(2), (c), 16464, subd. (b)(2), (4).)

Given these principles, we cannot find that the trustee of an irrevocable trust can release beneficiaries' claims for breach of fiduciary duty against a prior trustee without either notice to or consent of those beneficiaries.  Beneficiaries of an irrevocable trust, like Asaro, have their own direct claims for breach of fiduciary duty.  (See *Giraldin, supra,* 55 Cal.4th at p. 1065.)  The right to release a "claim belonging to the trust" does not empower a

---

11    We also note that "[a] provision in the trust instrument is not effective to relieve the trustee of liability (1) for breach of trust committed intentionally, with gross negligence, in bad faith, or with reckless indifference to the interest of the beneficiary, or (2) for any profit that the trustee derives from a breach of trust."  (§ 16461, subd. (b).)  Jon's argument is in tension with this statute, too, as it suggests that a trustee can be released for claims retrospectively by another trustee even where he could not be released prospectively by the settlor.

trustee to release claims belonging to the beneficiaries. And because beneficiaries cannot be bound even by their own settlement agreements with the breaching trustee if they did not know of their rights or material facts, it cannot be that beneficiaries have fewer protections when they have no notice at all of the potential claims.

Even if there were some circumstances in which such an agreement by a current trustee could bind beneficiaries, these are not among them. We agree with the trial court that there were multiple issues that would render enforcement of this agreement against Asaro inequitable.

Although Jon contends he was "an innocent party on one side of the bargain," neither the facts nor the law support his claim. As an initial matter, we have already explained why Jon's improper actions were instrumental in preventing Asaro from learning of and protecting his rights. Also, as explained further below, we conclude the trial court's finding of misappropriation with intent to defraud is supported by substantial evidence. (See § D., *post*.) Therefore, Jon, who owed fiduciary duties to the Trust,[12] purposely retained Trust assets as consideration for dismissing his petitions even though he knew he was not entitled to them. (See Restatement (Third) of Trusts § 2 (2003) ["[A] trustee's obligation to a trust constitutes an asset of the trust estate, whether that trustee continues administering the trust or is replaced by a successor trustee."]; see also Restatement (Third) of Agency

---

[12] Even if we consider Jon a "third party" to this transaction, he cannot complain about repercussions for his knowing participation in the cotrustees' breach of trust. (See, e.g., *City of Atascadero v. Merrill Lynch, Pierce, Fenner & Smith, Inc.* (1998) 68 Cal.App.4th 445, 460 ["[U]nder long-established trust law, trust beneficiaries retain the right to bring claims directly against third parties who have induced the trustee to commit a breach of trust, aided or abetted such a breach by the trustee, or received and retained trust property from the trustee in knowing breach of trust."].)

§ 8.01 (2006) ["[A]n agent may be subject to post-termination duties applicable to the agent's use of property of the principal and confidential information provided by the principal or otherwise acquired in the course of the agency relationship."].)[13] Jon cannot claim to have been acting in good faith.

We further agree with the trial court that Nicola had diminished capacity at the time of the settlement. The record likewise supports the conclusion that Jon believed Nicola was cognitively impaired. We need not find that Nicola lacked testamentary capacity or the ability to enter into a legal agreement to conclude that his significant cognitive limitations rendered him unable to adequately protect the interests of Trust beneficiaries.

Prior to the Settlement Agreement, Jon argued and submitted a declaration under penalty of perjury indicating that Nicola should be conserved given his lack of capacity. Reversing course, Jon now claims that Nicola was fully competent at the time of the Settlement Agreement. Fairly construed, however, the evidence does not support his new contention. To support his current argument, Jon relies on statements from physicians hired by Nicola or his agents to support the legal conclusion that Nicola did not lack testamentary capacity. But he glosses over the fact that even these physicians found Nicola had dementia and serious cognitive deficits.

---

[13] The California Supreme Court has relied on both of these restatements to inform its own decisions. (See *State ex rel. Dept. of California Highway Patrol v. Superior Court* (2015) 60 Cal.4th 1002, 1013, fn. 5 [citing Restatement (Third) of Agency as authority]; *Giraldin, supra*, 55 Cal.4th at p. 1073 [citing Restatement (Third) of Trusts as authority].)

In June 2011, Dr. Delbert Secrist wrote a letter after being asked to evaluate whether Nicola was competent to change trustees.[14] Secrist noted, "In the traditional evaluation and questioning of his competency, [Nicola] was very weak. This more likely reflects his level of education, lack of interest and curiosity, his particular work history being at sea most of his life, and carryover despondency following the death of his wife." Secrist found Nicola was "definitely showing and developing senile changes" and that "his most recent memory is very weak." He nevertheless concluded that Nicola "still ha[d] enough cognitive function to be competent in making [the] change of trustees for his estate."

In an evaluation later submitted to the court in connection with Jon's conservatorship petition, Secrist described Nicola's dementia diagnosis and concluded that Nicola was moderately impaired with respect to his knowledge of the time and place, as well as his ability to "[u]nderstand and appreciate quantities (deficits reflected by inability to perform simple calculations)" or to "[r]eason logically." He determined that Nicola had "major impairment" with respect to his: (1) "[a]bility to attend and concentrate (give detailed answers from memory, mental ability required to thread a needle)"; (2) "short term memory"; (3) "immediate recall"; and (4) ability to "[p]lan, organize, and carry out actions . . . in [his] own self-interest (deficits reflected by inability to break complex tasks down into simple steps and carry them out)." Secrist found Nicola was "so impaired as to be incapable of being assessed" with respect to his ability to "[r]eason using abstract concepts (deficits reflected by inability to grasp abstract aspects of his . . . situation or to interpret idiomatic expressions or proverbs)." He

---

14    It is unclear who retained Secrist, as both Matteo (Nicola's cotrustee) and Romano (Nicola's attorney) denied having done so.

opined that Nicola's "periods of impairment" did not "vary substantially in frequency, severity, or duration." Nonetheless, Secrist attached a one-sentence letter stating, "The above named gentleman has enough cognitive ability to manage his financial resources and to resist fraud and undue influence."

Similarly, Dr. Adam Zweig (who had been Nicola's treating physician) stated in a brief letter, "[Nicola] Giacalone has moderate dementia. This does not affect his decision making. Mr. Giacalone is able to comprehend the nature and extent of his trust and property."

A court-appointed conservatorship investigator wrote in his report, "The proposed conservatee was unable to remember the name of the property management agency and the current date and other major events. Therefore, he is not capable of managing his business." The investigator recommended the appointment of a third-party conservator and guardian ad litem in light of Nicola's deficits. He also stated, "An independent medical provider should assess the proposed conservatee to determine his level of care."

Other witnesses, including Jon, also observed that Nicola's capacity was in doubt. Nicola's longtime attorney objected to Jon about changing counsel for the Trust, writing that, "[I]n my opinion, your Uncle does not have the capacity to make such a request." Another attorney testified, "I had some concerns [about his capacity], but it was really under what circumstances could he get fully involved with everything, and that was obviously something he didn't quite reach that level." Matteo's sister testified that Nicola's "dementia had set in pretty bad" by the end of Jon's time as trustee and agreed he had "cognitive impairment" and had become "forgetful" "in the 2010 or 2011 time frame." Jon's brother Michael testified that by April 2011 "you couldn't engage in what [Michael] would consider [to be] a

meaningful discussion [with Nicola]," and that, at times, he seemed "confused a little bit."

At trial, Jon testified that as early as spring 2009 several nurses at the hospital where Antoinette was receiving treatment "observed [Nicola's] behavior and commented that he should probably be examined for cognition." Jon also testified that he was "surprise[d]" that Nicola did not know who Asaro was in 2010, despite adding him as a beneficiary to the Survivor's Trust in 2007. Jon said that he had concerns by May 2011 "that [Nicola] was slipping mentally" and said "the biggest trigger to [his] uncle's mental decline was the death [Antoinette] in November of 2010." Indeed, in his verified petition to remove Madelyn and Matteo as trustees, Jon alleged, "Petitioner believes, and thereon alleges that [Nicola] is subject to undue influence from those around him, including but not limited to the individuals acting as cotrustees."

Substantial evidence thus supports the trial court's conclusion that Nicola had severely diminished capacity at the time of the settlement. Perhaps more importantly, the record indicates that *Jon believed* Nicola was unable to manage his own affairs, let alone understand and carry out his duties as trustee.

In light of these circumstances—including lack of notice to the beneficiaries, Jon's complicity in depriving Asaro of notice, and Jon's knowledge of Nicola's diminished capacity—we need not address the trial court's finding that Matteo, Madelyn, and Romano were also conflicted. Needless to say, we are not persuaded by Jon's contention that public policy interests in settlement and mediation would be furthered by enforcing this Settlement Agreement. Such interests are substantially outweighed by

27

countervailing concerns with respect to this agreement. In sum, the trial court properly held that Asaro is not bound by the Settlement Agreement.

**D.** ***Substantial Evidence Supports the Trial Court's Findings of Elder Abuse of Antoinette***

The trial court found that Jon committed financial elder abuse against Antoinette (1) by "improperly converting and misappropriating $430,000 in Certificates of Deposit owned by Nicola and Antoinette to himself"; (2) by "improperly converting and misappropriating the Adams Avenue property to himself in exchange for a doctored promissory note that was all but worthless to Nicola and Antoinette"; and (3) "when he transferred money to himself from Nicola and Antoinette's accounts for alleged professional and trustee fees." Jon argues that these findings are not supported by substantial evidence.

Any error with regard to the trial court's elder abuse finding was harmless because the court did not award any additional damages for the elder abuse, and Jon does not challenge the sufficiency of the evidence supporting Asaro's breach of fiduciary claim. In any event, considering Jon's arguments on their merits, we find the trial court's decision is supported by substantial evidence.

### 1. *Any Error Was Harmless*

At the outset, we observe that Jon has not challenged the sufficiency of the evidence with respect to the breach of fiduciary duty claim. The court relied on the same actions in support of its findings on both the elder abuse and breach of fiduciary duty claims. The court awarded the value of the property misappropriated by Jon and damages pursuant to section 859 on the ground that Asaro had "succeed[ed] on his claim under Probate Code section 850 requiring Jon to return to the estate the assets he stole from

28

Antoinette."[15]  Thus, any errors were harmless because they did not result in the award of any additional damages.  (See *Century Surety Co. v. Polisso* (2006) 139 Cal.App.4th 922, 947–948 [where "jury did not award any damages for [malicious prosecution] cause of action," "any errors . . . in connection with [that] claim . . . were harmless because they did not affect the judgment"].)

## 2.  *The Trial Court's Findings Are Supported by Substantial Evidence*

Jon claims "[t]here was no substantial evidence, or any finding, that Jon took 'real or personal property' from [Antoinette] 'for a wrongful use or with intent to defraud, or both,' or by undue influence, as defined by Welfare and Institutions Code [section] 15610.30 subdivision (a)(1), (3)."  " 'In reviewing a judgment based upon a statement of decision following a bench trial,' we 'apply a substantial evidence standard of review to the trial court's findings of fact.' "  (*Symons Emergency Specialties v. City of Riverside* (2024) 99 Cal.App.5th 583, 598.)  "Substantial evidence is evidence of ponderable legal significance that is reasonable in nature, credible, and of solid value." (*Holden v. City of San Diego* (2019) 43 Cal.App.5th 404, 410.)  "If . . . 'substantial' evidence is present, no matter how slight it may appear in comparison with the contradictory evidence, the judgment must be upheld." (*Howard v. Owens Corning* (1999) 72 Cal.App.4th 621, 631.)

### a.  *Certificates of Deposit*

Jon took CDs worth approximately $430,000 from joint accounts under Antoinette and Nicola's name.  Although Jon testified at trial that Nicola

---

15    Contrary to Jon's suggestion, it is clear from the Statement of Decision that the trial court did not award damages under section 859 attendant to the elder abuse claim.

intended these funds to be a gift, the trial court found Jon had "improperly convert[ed] and misappropriat[ed]" them at a time when "Nicola had diminished capacity," "Antoinette did not consent and could not have consented," and "Nicola also did not consent." Further, the trial court found the property was "in bad faith wrongfully taken" for purposes of section 859. Substantial evidence supports the court's findings and its conclusion that Jon committed financial elder abuse by taking property from an elder "for a wrongful use or with intent to defraud, or both." (Welf. & Inst. Code, § 15610.30.)

Jon deposited the money from both CD accounts to a joint account with Nicola before gradually transferring it to himself or his family members. Jon thus gradually siphoned the money away from this joint account rather than taking the funds outright, as one would normally handle a gift. This unusual arrangement supports the trial court's inference that the property was taken with an intent to defraud. (Cf. *Lovejoy v. AT&T Corp.* (2004) 119 Cal.App.4th 151, 161 [intent to defraud may be inferred when defendant took plaintiff's money without his knowledge or consent while concealing material facts].)

Jon testified that his mother told him the money "had been set aside for" him. But these CDs were not excepted from Nicola and Antoinette's 2005 transfer of *all* of their property to the Trust. Further, the two CDs were held in two separate accounts at two separate banks, making it less plausible that this was money that had been "set aside" as a gift to one person. Both Nicola and Jon's mother were deceased by the time of trial,[16] and Jon offered no

_____

16    We grant Jon's unopposed request that the court take judicial notice of the date of his mother's death. The request otherwise seeks judicial notice of information available in the record on appeal and is thus denied as unnecessary.

corroboration for his self-serving testimony. Indeed, Nicola filed a declaration in opposition to Jon's conservatorship petition in which he stated that money was transferred out of his joint account with Jon (the one containing the CD funds) without his consent, belying Jon's claim that those funds had been gifted. The trial court was entitled to, and apparently did, disregard Jon's testimony as not credible. (*Rodney F. v. Karen M.* (1998) 61 Cal.App.4th 233, 241 ["The trier of fact is not required to believe even uncontradicted testimony."].)

In sum, the circumstances under which Jon took the CD funds are consistent with a fraudulent misappropriation and inconsistent with a reasonable belief that the funds were gifted. Substantial evidence supports the trial court's findings.

b. *The Adams Avenue Property*

Jon took the Adams Avenue Property from the Trust, testifying this was also a "gift." The trial court found he "improperly convert[ed] and misappropriat[ed] the Adams Avenue [P]roperty to himself in exchange for a doctored[17] promissory note that was all but worthless to Nicola and Antoinette" "at a time when Antoinette was afflicted with dementia and living in a care facility and when Nicola had diminished capacity." It determined that "[n]either Nicola nor Antoinette consented to those misappropriations, and Antoinette could not have consented to them." The court found the Adams Avenue Property was also "in bad faith wrongfully taken" for purposes of section 859. The circumstances of this conveyance are inconsistent with a gift and support a conclusion that Jon took the property

---

17 Here it seems the court confused Jon's promissory note for the $970,000 brokerage account (of which there were inexplicably two different versions) and the promissory note for the Adams Avenue Property.

with intent to defraud and by undue influence. (See Welf. & Inst. Code, § 15610.30.)

Jon executed a promissory note for $196,000, payable to Nicola individually, that was to be repaid over the course of 15 years or forgiven after Nicola's death. Jon (who was in real estate professionally) did not have the property appraised before drafting this note. Evidence at trial showed that its value was substantially higher—approximately $261,000. The unsecured promissory note written to Nicola, who was in his mid-80's, was actuarially unlikely to come due. And, by significantly undervaluing the property, Jon would have arranged a windfall to himself even if he had repaid the entire note. The pretense of the note undercuts Jon's argument that the Adams Avenue Property was gifted and supports the trial court's conclusion that it was taken by subterfuge.

Nicola also stated in a declaration that Jon "bothered" and "pestered" him to transfer the Adams Avenue Property "over several months," "to the exten[t]" that Nicola finally relented. This supports that the property was taken by "undue influence," meaning "excessive persuasion that causes another person to act . . . by overcoming that person's free will and results in inequity." (Welf. & Inst. Code, §§ 15610.70, 15610.30, subd. (a)(3).)

c.    *Real Estate and Trustee Fees*

The Trust paid Jon $5,000 a month in "co-trustee fees" from April 2010 to May 2011, and $30,000 in "real estate" fees in December 2011. Jon protests, without elaboration, to the lack of any "finding by the trial court that the trustee's fees or professional fees paid to Jon were not valid compensation for his services to Nicola." To the contrary, however, the court found that "Jon further breached his fiduciary duties to the Family Trust and the Residual Trust beneficiaries and committed financial elder abuse against

32

Antoinette when he transferred money to himself from Nicola and Antoinette's accounts for alleged professional and trustee fees." Implicit in this ultimate finding is that the fees "were not valid compensation." Jon fails to make any argument regarding the *evidence* supporting this finding, thereby forfeiting such arguments. (*Falcone, supra*, 164 Cal.App.4th at p. 830 ["We are not bound to develop appellants' arguments for them."].)[18]

### E. *Damages Under Section 859*

Finally, Jon contests the damages awarded by the trial court pursuant to section 859. That section provides that where the court finds property has been wrongfully taken from a trust (among other things), the defendant is "liable for twice the value of the property recovered by [the] action."[19] Jon claims the statute only permits the award of double damages—the value of the property doubled—rather than the value of the property *plus* a penalty

---

[18] We note that a portion of the trustee fees and the real estate fees were awarded after Antoinette died in November 2010. Taking this money cannot have constituted elder abuse of Antoinette at that time. However, because the court also found this constituted a breach of fiduciary duty, and Jon does not appeal that finding, no modification of the award is warranted.

[19] The full text of the statute reads: "If a court finds that a person has in bad faith wrongfully taken, concealed, or disposed of property belonging to a conservatee, a minor, an elder, a dependent adult, a trust, or the estate of a decedent, or has taken, concealed, or disposed of the property by the use of undue influence in bad faith or through the commission of elder or dependent adult financial abuse, as defined in Section 15610.30 of the Welfare and Institutions Code, the person shall be liable for twice the value of the property recovered by an action under this part. In addition, except as otherwise required by law, including Section 15657.5 of the Welfare and Institutions Code, the person may, in the court's discretion, be liable for reasonable attorney's fees and costs. The remedies provided in this section shall be in addition to any other remedies available in law to a person authorized to bring an action pursuant to this part." (§ 859.)

measured by twice the property's value.  He also contends the trial court improperly awarded section 859 penalties to Asaro instead of the Trust.

The answer to each of these contentions turns on the meaning of the words used in section 859 and presents "a question of law that we review de novo." (*Bruns v. E-Commerce Exchange, Inc.* (2011) 51 Cal.4th 717, 724.) "Our fundamental task in interpreting a statute is to determine the Legislature's intent so as to effectuate the law's purpose.  We first examine the statutory language, giving it a plain and commonsense meaning.  We do not examine that language in isolation, but in the context of the statutory framework as a whole in order to determine its scope and purpose and to harmonize the various parts of the enactment." (*Coalition of Concerned Communities, Inc. v. City of Los Angeles* (2004) 34 Cal.4th 733, 737.)  "If the language is clear, [we] must generally follow its plain meaning unless a literal interpretation would result in absurd consequences the Legislature did not intend.  If the statutory language permits more than one reasonable interpretation, [we] may consider other aids, such as the statute's purpose, legislative history, and public policy." (*Ibid.*)

### 1.    *The Trial Court Properly Calculated the Penalty*

Jon's first argument frames the question whether, in addition to the compensatory restoration of property or its equivalent value, section 859 authorizes an *additional penalty* measured by (a) the value of the property, or (b) twice its value.  The court held Jon was required to return $547,370 to the Trust due to his breaches of fiduciary duty and elder abuse.  Then, because Asaro "succeed[ed] on his claim under . . . section 850 requiring Jon to return to the estate the assets he stole from Antoinette," the court determined that Asaro was "entitled, pursuant to . . . section 859, to double damages in the

34

sum of $1,094,740"—twice $547,370—as a penalty.[20]  Jon claims the court

should only have awarded an additional $547,370 under section 859.

Although at least one court has agreed with Jon's reading of the statute, we

do not.

Under section 850, certain parties can bring an action "requesting that

the court make an order under" Part 19 of the Probate Code.  Such orders

include "an order authorizing and directing the personal representative or

other fiduciary, or the person having title to or possession of the property, to

execute a conveyance or transfer to the person entitled thereto, or granting

other appropriate relief."  (§ 856.)  Section 859 separately permits the award

of " 'twice the value of the property recovered by an action under this part' "

in addition to any other remedies available.  We have previously held that

return of property is fundamentally "remedial in nature" while "double

damages" under section 859 are "punitive in nature."  (*Estate of Young* (2008)

160 Cal.App.4th 62, 89 (*Young*).)

In interpreting this statute, we do not write on a blank slate.  Jon relies

on *Conservatorship of Ribal* (2019) 31 Cal.App.5th 519 (*Ribal*), in which the

court interpreted section 859 to permit recovery of the property taken in bad

faith plus the value of that property as damages.  The court reasoned, "If the

Legislature had intended damages to be tripled, it would have written

something akin to 'the person shall be liable for [*three times*] the value of the

property recovered by an action under this part.'  [Citation.]  In our

experience, the Legislature knows how to distinguish between double

---

[20]   Jon does not argue that the court improperly doubled the value of the
property including statutory interest ($547,370) as opposed to the value of
the recovered property.  Accordingly, he has forfeited that argument.  (See,
e.g., *Browne, supra*, 213 Cal.App.4th at p. 726.)

damages and treble damages and has provided for each in numerous contexts." (*Id.* at p. 525.)

By contrast, in *Estate of Ashlock* (2020) 45 Cal.App.5th 1066 (*Ashlock*), the court considered the statute and prior caselaw (including *Ribal*) and came to the opposite conclusion. *Ashlock* concluded that the language of the statute unambiguously applied to permit *both* the return of property to the estate and the award of twice the value of the property where appropriate. (*Id.* at p. 1074.) The court stated that "[t]he statutory language is no less clear when the wrongfully taken property is cash, but confusion may arise due to the tendency of practitioners and courts to informally refer to section 859 as a 'double damages' provision." (*Ibid.*) By way of illustration, the court posited: "[A]ssume that . . . the petitioner seeks to recover $10,000. The money was withdrawn from the decedent's bank account by the opposing party. The probate court determines the decedent's estate is entitled to the $10,000 and, pursuant to section 856, orders the opposing party to return it. The opposing party is additionally found to have acted in bad faith. Pursuant to section 859, the opposing party 'shall be liable for twice the value of the property recovered,' i.e., $20,000. When the judgment is entered, it reflects a total monetary obligation of $30,000, but $10,000 of that sum is the 'recovered' amount. The obligation to return the money arises under section 856; the liability under section 859 is a punishment for culpable misconduct." (*Id.* at pp. 1074–1075.)

The *Ashlock* court considered approaches taken by other courts and rejected the holding of *Ribal*. It noted that "[u]nlike section 856, section 859 is punitive in nature." (*Ashlock, supra,* 45 Cal.App.5th at p. 1076, citing *Young, supra,* 160 Cal.App.4th at p. 88.) *Ribal*'s assumption that "section 859 subsumes the wrongdoer's obligation under section 856 to return

36

the misappropriated property" ignores that the two provisions provide different remedies under different standards. (*Ashlock*, at p. 1077.)

We agree with *Ashlock*, which we find is also consistent with how most other courts have read section 859. (See, e.g., *Keading v. Keading* (2021) 60 Cal.App.5th 1115, 1130 ["The court doubled the stipulated value of $761,665 to reach a statutory penalty of $1,523,330. The stipulation constituted substantial evidence to support the court's calculation."]; *Estate of Kraus* (2010) 184 Cal.App.4th 103, 118 (*Kraus*) [affirming award of "statutory penalty" of $394,804 in addition to "the value of the property recovered, $197,402"].) In particular, in *Young* this court explained the divisible nature of relief pursuant to section 850 et seq. (*Young*, *supra*, 160 Cal.App.4th at p. 90.) A section 859 award is predicated on "a finding of bad faith taking of an estate's property" and "adjudication of a right to recovery of that property." (*Ibid.*) Only then does the court assess "liability 'for twice the value of the property recovered by an action under this part.' " (*Ibid.*)

We note the concern in *Ribal* that section 859 affects a treble damages award under what is often called a "double damages" provision. (*Ribal*, *supra*, 31 Cal.App.5th at p. 525.) As an initial matter, however, section 859 itself does not call for "double damages," so we need not struggle with that language as a matter of direct statutory interpretation. Furthermore, "treble damages" refers to the recovery of compensatory damages plus twice the value of those compensatory damages. (See, e.g., *X.M. v. Superior Court* (2021) 68 Cal.App.5th 1014, 1023 ["[T]reble damages are three times compensatory (or actual) damages, which are themselves designed to make a plaintiff whole or put them in the position they would be in had the injury not occurred."].) By its terms, section 859 does not award "treble damages." To the extent the ultimate result can be characterized as "treble," this is instead

37

the joint effect of sections 856 and 859: section 856 authorizes the return of property (the compensatory component) and *then* section 859 authorizes a penalty of twice the value of that compensatory component. It is therefore more accurate to refer to section 859 by itself as awarding a "double" penalty.

### 2. *The Trial Court Had the Authority to Award Penalties to Asaro*

The court awarded twice the value of the property as a penalty "to Asaro individually because the recovery against Jon [was] the result entirely of his efforts in this litigation, and because a contrary result could result in a partial payment to Jon of an amount awarded against him because of his own wrongdoing, which would be an inequitable result." Jon asserts this was error, arguing that penalties under section 859 are only payable "to the estates of the decedents or to the Trust, for future proceedings to determine the proper distribution," and not to Asaro. We conclude that the award of the section 859 penalty directly to Asaro was both permissible under the statute and a reasonable exercise of the court's discretion.

Section 859 says only that "the [defendant] shall be liable" for the penalty, not that any particular party shall recover it. "The statutory emphasis is not on to whom the property belongs, but whether the person in possession in bad faith wrongfully acquired it." (*Kraus*, *supra*, 184 Cal.App.4th at p. 117.)

The remainder of the provision further contemplates that other parties may recover from the defendant. The next sentence states that "the person may, in the court's discretion, be liable for reasonable attorney's fees and costs." (§ 859.) It will be the person who brought the action—here, Asaro— who has incurred "attorney fees and costs" and is thus entitled to recover them. Indeed, Jon does not dispute that Asaro, not the Trust, should recover these amounts.

In addition, the final sentence says, "The remedies provided in this section shall be in addition to any other remedies available in law to *a person authorized to bring an action pursuant to this part.*" (§ 859, italics added.) The only clause referencing the party to whom remedies may be awarded thus suggests that a person who can recover "remedies" under section 859 is "a person authorized to bring an action pursuant to this part." Although in many cases, section 859 penalties may be properly payable to a conservatee, minor, elder, dependent adult, trust, or estate, the statute does not expressly or impliedly require that result.

Jon argues the statute is ambiguous and that we should rely on aspects of the legislative history to guide our interpretation. But having reviewed much of the legislative history of section 859, we do not think it sheds more light on the Legislature's intent than the statutory language itself. (See *Citizens to Preserve Overton Park, Inc. v. Volpe* (1971) 401 U.S. 402, 413, fn. 29 ["look[ing] primarily to the statutes themselves to find the legislative intent" instead of ambiguous legislative history].)

For example, Jon claims that prior versions of section 859 support his position because they stated the penalty was "recoverable in an action by the personal representative for the benefit of the estate" or could be "recovered for the benefit of the estate." (See, e.g., former § 9869, added by Stats. 1994, ch. 806 (Assem. Bill No. 3686), § 32; Stats. 1851, ch. 124, p. 462, § 116.) The Legislature pretermitted this language when enacting section 859 in 2001 and has not added it back in subsequent amendments. (See § 859; Stats. 2011, ch. 55 (Assem. Bill No. 354), § 1; Stats.2001, ch. 49 (Sen. Bill No. 669), § 1.) In the absence of contrary evidence, this continued omission suggests "the Legislature intend[ed] to change the meaning." (*People v. Mendoza* (2000) 23 Cal.4th 896, 916.) We have reviewed the available

legislative history and find nothing seems to address this issue, one way or the other. (Compare, e.g., Sen. Rules Com., Off. of Sen. Floor Analyses, analysis of Sen. Bill No. 669 (2001–2002 Reg. Sess.) as amended June 7, 2001, with Sen. Judiciary Com., Off. of Sen. Floor Analyses, analysis of Assem. Bill No. 354 (2011–2012 Reg. Sess.) as amended June 6, 2011, p. 2.) Thus, although we cannot divine clear legislative intent from this history, we have found nothing sufficient to undermine our interpretation of the operative statutory language. (See *Ardestani v. INS* (1991) 502 U.S. 129, 137 [concluding "ambiguities in the legislative history are insufficient to undercut the ordinary understanding of the statutory language"].)

Jon also relies on certain language from *Kraus*, which he claims supports his interpretation. In *Kraus*, the defendant argued he should not have to pay damages under section 859 because the trial court had not yet determined how the misappropriated funds should be distributed. (*Kraus*, *supra*, 184 Cal.App.4th at p. 117.) The court found that, because defendant "in bad faith wrongfully took [the decedent's] money, he could properly be found liable for twice the value of that property." (*Ibid.*) The appellate court affirmed the penalty even though "the probate court did not award the money to anyone," but "merely placed the misappropriated funds in [the decedent's] estate pending the probate court's ultimate disposition of the funds." (*Id.* at p. 118.)

> Jon points to an out-of-context statement from the following passage:
>
> "Here, the probate court found David in bad faith wrongfully took money that was recoverable under section 850. At the time it was misappropriated, the money belonged to Janice. Now that Janice is deceased, the money belongs to her estate, her trust, or, potentially, some party claiming against her estate. But it is in David's possession. Because the probate court found David in bad faith wrongfully took Janice's money, he could properly be found liable for twice the value of that property. The statutory

40

emphasis is not on to whom the property belongs, but whether the person in possession in bad faith wrongfully acquired it. As discussed above, the probate court is charged with marshalling, protecting, and properly distributing property claimed to belong to a decedent."

(*Kraus*, *supra*, 184 Cal.App.4th at p. 117.) Contrary to Jon's suggestion, we do not understand the statement "the money belongs to her estate, her trust, or, potentially, some party claiming against her estate" to refer to the section 859 penalty, but rather the money stolen by David. In our view, *Kraus* does not mandate the award of the penalty to anyone in particular. Rather, it affirms that "probate court[s] may apply general equitable principles in fashioning remedies and granting relief." (*Id.* at p. 114.)[21]

Here, the Trust has already been made whole by return of the misappropriated property. The court correctly observed that Jon, as a beneficiary of the Residual Trust, would partially recoup the penalty if it were paid into that trust. This would undermine, or at least dilute, the punitive effect of the penalty. (See *Young*, *supra*, 160 Cal.App.4th at p. 88.) In addition, none of the other beneficiaries joined Asaro in this litigation, leaving him to shoulder the burden alone. In these circumstances, the court's award did not constitute an abuse of discretion.

---

[21] For the first time at oral argument, Jon claimed his position is also supported by *Quiroz v. Seventh Ave. Center* (2006) 140 Cal.App.4th 1256 (*Quiroz*). In that case, a plaintiff sought enhanced penalties under the Elder Abuse Act based on her *own* wrongful-death claim. (*Id.* at pp. 1282–1284.) Among other distinctions, Asaro was properly asserting a survivor claim on behalf of Antoinette, and the trial court did not award section 859 damages based on the elder abuse claim but rather based on his own breach of fiduciary duty claim. We thus find *Quiroz* irrelevant to the question presented here.

41

## DISPOSITION

Insofar as it adjudicates Asaro's claims against Jon, the judgment is affirmed. Asaro is entitled to his costs on Jon's appeal.

DATO, Acting P. J.

WE CONCUR:

CASTILLO, J.

RUBIN, J.